UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**DONALD BUMPAS,**
        **Plaintiff,**

vs.                                            Case No. 8:03-CV-2105-T-27-TGW

**UNUM LIFE INSURANCE**
**COMPANY OF AMERICA,**
        **Defendant.**
_____/

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

**BEFORE THE COURT** are Defendant's Motion for Summary Judgment (Dkts. 20) and Plaintiff's Motion for Summary Judgment (Dkt. 36).[1]

In this action, Donald Bumpas ("Plaintiff") sued UNUM Life Insurance Company of America ("Defendant"), alleging that Defendant wrongfully denied his claims for short-term and long-term disability benefits in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).

**Factual Background**

Plaintiff began working for Nielsen Media Research on June 27, 1997. (R. 279) He was promoted to the position of supervisor in 2000 and his job duties were largely computer and office

---

[1] Although styled as motions for summary judgment, these motions are more correctly construed as motions for final judgment, given the nature of challenges to benefit determinations under ERISA. In ERISA cases, the district court is more akin to an appellate court than a trial court. Typically, a review of the benefit decision is made by the district court based on the administrative record available to the decision-maker at the time of the decision. Evidence is rarely taken and therefore the usual tests for summary judgment, such as whether genuine issues of material fact exist, ordinarily do not apply. *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

1

work. (R. 64) On October 31, 2002 he was notified that his employment was terminated as of that date, but that he would receive his previously approved vacation through November 29, 2002. (R. 280) He was given a form entitled Summary of Benefit Entitlements Under the Career Transition Plan that listed his "Effective Date of Eligible Termination" as November 29, 2002. (R. 279) He was given severance pay through January 22, 2003. (R. 279) His employer informed Defendant that "he was terminated from employment on 10/31/02 . . . for disciplinary reasons." (R. 270) On January 15, 2003, a week before his severance pay was to end, Plaintiff filed a claim with Defendant for disability benefits stating that he became disabled as of October 31, 2002. (R. 84)

Plaintiff injured his back in early 2000. (R. 222) An MRI ordered by his family practice physician in September 2000 showed degenerative disk disease, spinal stenosis, and a herniated disk.[2] (R. 218) On February 27, 2001, he saw an orthopedist, Dr. Petersen, who noted that Plaintiff was in pain and "quite miserable." (R. 222) Dr. Petersen's office notes indicated that his exam on that date was "essentially a normal exam with discomfort in his lower back," that his "range of motion was reasonable." (R. 222). Dr. Petersen recommended epidural steroid injections. (R. 222) On March 23, 2001, Plaintiff again saw Dr. Petersen after the epidural steroid injections. Dr. Petersen noted that Plaintiff's "radicular symptoms are dramatically better. His range of motion is reasonable and [Plaintiff] is very happy." (R. 223)

On July 25, 2001, Plaintiff returned to Dr. Petersen with "a recurrence of his radicular symptoms," reporting to the doctor that he was "absolutely miserable." (R. 223) He had another steroid injection, which "seemed to have helped some." (R. 224) At his follow-up visit after the

---

[2] There is no indication in the record that any further testing was performed related to Plaintiff's back pain between the MRI in 2000, a CT scan in early 2001and the filing of his disability claim in 2003.

2

injection on August 22, 2001, Dr. Petersen recommended that he begin in-office vertical traction exercises. (R.224) Plaintiff did not return to Dr. Petersen's office to begin the traction exercises until February 1, 2002. He continued in-office traction treatment one or more times per week from February 1 through May 15, 2002. Dr. Petersen noted on May 10, 2002 that Plaintiff "is doing very well with the vertical traction treatment. . . , [h]is range of motion is improved, [and Plaintiff] states that he is much better with the vertical traction treatment being done at least once a week." (R. 234)

On May 23, 2002, Plaintiff returned to Dr. Petersen's office with an area of point tenderness, for which he was given a steroid injection. (R. 235) Dr. Petersen's office notes indicate that Plaintiff was to "follow up in a couple of weeks for recheck, sooner if there are problems." (R. 235) Plaintiff did not, however, visit Dr. Petersen again until two months *after* he filed his claim for disability benefits, and nearly five months after he claimed to have become disabled. (R. 134) At that time, Dr. Peterson noted no change in Plaintiff's condition since the May 2002 visit. Plaintiff's treatment and medication plan remained the same: "He will continue with his exercise protocol and his pain medications." Although Dr. Peterson noted that Plaintiff was "unable to work" in his notes of the March 2003 visit, none of Dr. Petersen's records prior to the March 2003 visit include any notations that Plaintiff was restricted from any activities or unable to work. Significantly, on January 17, 2003, Defendant contacted Dr. Petersen's office and was told that Plaintiff's last visit was on May 23, 2002 and that he was "not placed out of work by this office." (R. 63-64) .

On June 19, 2001, Plaintiff underwent aortic valve replacement surgery with no complications. (R. 200) The office notes from his September 19, 2002 visit to his cardiologist, Dr. Turker, indicated that Plaintiff continued to do well after his aortic valve replacement and that his hypertension was well-controlled. (R. 211) At that visit, just over a month before his last day of

3

work at Neilsen, Dr. Turker noted that Plaintiff continued to "walk three miles per day in less than 45 minutes." (R. 211)

Dr. Flores, Plaintiff's family practice physician, responded to Defendant's request for information, stating that he had advised Plaintiff to stop working on October 31, 2002 because of chronic back pain. (R. 244-245) In the attending physician's statement, he indicated that Plaintiff could only sit, stand or walk for an hour each, but made a notation that these limitations were "without pain medication." (R. 241) On the same form, he indicated that Plaintiff was taking Lortab, a pain medication. (R. 240)

Dr. Flores' office notes indicate that Plaintiff visited his office on July 31, 2002 but not again until November 20, 2002. (R. 205-06) In the office notes from the July 31 visit, Dr. Flores noted Plaintiff's history of low back pain, that he had seen little improvement of his pain with Dr. Petersen's traction device, and that he was to take vicodin as needed for pain. (R. 205) His description of the physical exam as related to Plaintiff's back stated: "with mild kyphosis. Some tenderness noted in the lumbosacral and decreased mobility." (R. 205) There is no indication that Plaintiff was restricted from work or that any limitations were placed on his activities. In the notes from the November 20 visit, Dr. Flores made no reference to Plaintiff's history of back pain except to note that he was taking vicodin as needed and describe his physical exam as related to his back in almost identical terms as he did on July 31. (R. 206) Dr. Flores noted that Plaintiff was "planning to change jobs since they are eliminating his job at Nielsen" and that Plaintiff "was not very happy about leaving but he has a severance package." (R. 206) Dr. Flores did not, however, indicate that he was placing any restrictions on Plaintiff's ability to work or instructing him to limit his activities in any way. (R. 206)

Defendant's medical department reviewed Plaintiff's medical records. Dr. Brock noted that there was no exacerbated pathology or findings within the five months prior to and four months following Plaintiff's last day of work. He observed that Plaintiff's symptomatology was being reported as significantly increasing at a time when there was no explanation as to why he would have any exacerbating factors and found that there was no documented medical reason for any significant change in his physical capacities as of Plaintiff's stated inability to work.. Nurse DiMatteo found that Plaintiff had been functional since 2000 and correctly observed that his records revealed no changes in his clinical condition or course of treatment as of the time he stopped working. Defendant denied Plaintiff's claims for short-term and long-term disability benefits because Dr. Flores' certification of his disability did not occur until January 2003, months after his termination from work, which ended his coverage under the plan. Defendant concluded:

> Dr. Flores' report on January 23, 2003 that he advised you to stop working as of October 31, 2002 is inconsistent with the information in his office treatment notes, and raised further questions concerning the credibility of his representations about your reported condition. You were able to perform your occupation until the day that your employment was terminated on October 31, 2002, and the information in your file did not demonstrate any change in your condition or in your physical capacity at or near that time. Although your position with your employer was terminated, the information in your file did not demonstrate that your medical condition prevented you from performing your occupation for you (sic) former employer or for any other employer.

(R. 274)

## The Plan

In pertinent part, the Long Term Disability Plan provides:

"**Eligible Group(s):** All employees of VNU, Inc. in active employment." (Dkt. 24; POL004)

"**Active Employment** means you are working for your Employer for earnings that are paid regularly and that you are performing the material and substantial duties of your regular

occupation. . . . Normal vacation is considered active employment." (Dkt. 24; POL033)

"**When does your coverage end?** Your coverage under the policy or a plan ends on the earliest of:. . . the last day you are in active employment." (Dkt, 24; POL013)

"**What information is needed as proof of your claim?** Your proof of claim, provided at your expense, must show: that you are under the regular care of a physician;. . .the date your disability began; the cause of your disability; the extent of your disability, including restrictions and limitations preventing you from performing your regular occupation. . . ."

"**How does UNUM define disability?** You are disabled when UNUM determines that: you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury." (Dkt. 24; POL015)

"**Material and Substantial Duties** means duties that: are normally required for the performance of your regular occupation; and cannot be reasonably omitted or modified. . . ." (Dkt. 24; POL034)

The Short Term Disability Plan has the same eligibility requirements as the Long Term Disability Plan. Other relevant provisions include:

"**When STD coverage ends** Your eligibility for STD coverage ends on the date on which any of the following occurs: . . .the date your employment terminates for any reason. . . ." (Dkt. 24; SPD007)

"**How to file a claim** . . . You are required to file a claim with and be approved for coverage by UNUM in order to receive benefits. You and your doctor must provide proof that you: are disabled due to illness or injury; and are under appropriate treatment and care of a licensed, practicing physician." (Dkt. 24; SPD006)

**Standard of Review**

ERISA does not provide a standard of review for decisions by a plan administrator or fiduciary in actions challenging benefit determinations under § 1132(a)(1)(B). *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 108-09 (1989); *Paramore v. Delta Air Lines,* 129 F.3d 1446, 1449 (11th Cir. 1997). The Supreme Court has established that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the

6

administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Bruch*, 489 U.S. at 115.

Here, the parties agree that because the Plan vests discretion in Defendant as the administrator and because the plan administrator is also the insurer of the plan, the heightened arbitrary and capricious standard applies. (Dkt. 20 at 4-5; Dkt. 28 at 1); *see Williams v. Bellsouth Telecommunications, Inc.,* 373 F.3d 1132 (11th Cir. 2004). Under this standard, the court must first conduct a *de novo* review of the administrative record to determine whether the fiduciary's decision was correct. A decision is not correct if, after reviewing the record and plan documents *de novo*, the court disagrees with the administrator's interpretation of the plan. *See HCA Health Services of Georgia, Inc. v. Employers Health Insurance Co.*, 240 F.3d 982, 995 (11th Cir. 2000); *Williams v. Bellsouth Telecommunications, Inc.,* 373 F.3d at 1137-38. If this court agrees with the administrator, the inquiry ends. *Id.*

## Discussion

According to the plan, Plaintiff's coverage ended on the last day of his active employment with Nielsen. The parties disagree as to whether Plaintiff's active employment ended on October 31, 2002, the day he was terminated and no longer reported to work, or on November 29, 2002, the last day of his approved vacation. The plan defines "active employment" to include periods of "normal vacation." It is unclear whether "normal vacation" includes vacation taken after termination. Notwithstanding, it is irrelevant to a resolution of this case because no credible medical evidence was presented to Defendant to establish that Plaintiff was disabled as of either date.

Plaintiff was required to present to Defendant proof of the date he became disabled. The plan states that a claimant is "disabled when [Defendant] determines that: you are limited from

7

performing the material and substantial duties of your regular occupation due to your sickness or injury." Plaintiff continued working until the day he was terminated. He provided no contemporaneous records from any physician indicating that he was limited from performing his occupation as of either October 31, 2002 or November 29, 2002.

It was not unreasonable for Defendant to rely on the contemporaneous treatment notes of Plaintiff's physicians, rather than the post hoc certification of disability by Dr. Flores and Dr. Peterson's March 2003 opinion that Plaintiff could not work. Simply put, the contemporaneous medical records contradict Dr. Flores' January 2003 certification that Plaintiff was disabled at the time of his last day of work. Particularly troubling is Dr. Flores' statement that he advised Plaintiff to stop working as of October 31, 2002, coincidentally the very day Plaintiff was terminated, when the last time Plaintiff saw Dr. Flores was more than three months prior to the termination. Moreover, there is no notation in Dr. Flores' chart of any contact whatsoever between Plaintiff and Dr. Flores in or near October 2002. In fact, during the next office visit on November 20, Dr. Flores' notes indicate that Plaintiff informed him he was looking for a new job. Those notes make no indication, however, that Dr. Flores instructed Plaintiff not to work or even placed limitations on the type of work he could perform.

Finally, Dr. Flores' notes reflect no change in the results of his physical exam of Plaintiff's back between March and November 2002. Further, Plaintiff did not visit his orthopedist until March 5, 2003, nearly five months after his claimed onset of disability caused by severe back pain. No new testing or medication was ordered by any physician and Plaintiff's treatment plan was not changed at all. Defendant was entitled to consider, in evaluating the credibility of Plaintiff's claim of disability onset and his physician's statements, the timing of Plaintiff's termination, the timing of

8

his medical visits, and the end of his severance benefits. Defendant was likewise entitled to draw reasonable inferences from those circumstances and rely upon its in-house medical review by Nurse DiMatteo and Dr. Brock. Under theses circumstances, Defendant was reasonable in rejecting the opinions of Dr. Flores and Dr. Peterson. *See Turner v. Delta Family Care-Disability & Survivorship Plan,* 291 F.3d 1270 (11th Cir. 2002)(plan administrator not required to give deference to treating physician's opinion).

Upon review of the record and the relevant provisions of the plan, the court concludes, after a *de novo* review of the record and plan, that Defendant's interpretation of the plan and decision to deny Plaintiff's claim for benefits was not wrong. Defendant's denial of benefits is therefore affirmed. Accordingly, it is

**ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment (Dkt. 20) is **GRANTED.** Plaintiff's Motion for Summary Judgment (Dkt. 36) is **DENIED**. Judgment shall be entered in favor of Defendant and against Plaintiff. The clerk is directed to close the case and deny all pending motions as moot.

**DONE AND ORDERED** in chambers this 28th day of September, 2005.

JAMES D. WHITTEMORE
United States District Judge

Copies to:
Counsel of Record

9